Case No. 15-5037, Food & Water Watch, Inc. et al. Appellants v. Thomas J. Vilsack in his official capacity as the U.S. Secretary of Agriculture et al. Mr. Corrigan for the Appellants, Mr. Tenney for the Appellees. Mr. Corrigan, good morning. Good morning.  The issue before this Court is whether plaintiffs have standing to pursue their claims, but I'd like to provide the Court with a little context of the underlying dispute. Nearly 60 years ago, Congress passed the Poultry Products Inspection Act, a law that placed federal inspectors on poultry company slaughter lines to inspect each and every carcass, a requirement that Congress specifically designed to protect consumers from adulterated and unwholesome poultry. The government's challenged new poultry inspection system rules rewrite and roll back this requirement by pulling inspectors from slaughter lines and giving poultry company employees the unfettered ability to rework carcasses and hide adult fecal matter and other signs of adulteration, while allowing line speeds to ramp up nearly four times faster so that government inspectors are tasked with inspecting 2.3 birds per second in literally the blink of an eye. Plaintiffs, Food and Water Watch... Is this program in effect now since there's no preliminary injunction? Is it in effect now? That is correct. The government has been moving forward on approving facilities for the new program. Do we have any information about how many facilities are now participating in the program? We have an estimate right now, although it's informal, that about 50, I believe, have moved forward or been accepted for this program. I'm not aware at this point where they are in the process, however. Have they started processing the food? Is the food being processed pursuant to this program? Well, it should be remembered also that part of this rulemaking was based on a pilot project of 20 facilities, and those facilities have continued in operation under the new rules and are producing poultry even today. Do we have any sense then of what the current percentage of poultry is that's coming out that's produced through this program? No, and I think it's important for your honors to understand that we have what the government estimates will be the amount of poultry, and that's 99.9% of all domestic poultry will be produced by rules operating under this system. I'm aware of that. I'm trying to figure out what the, because there's a lot of talk about standing based on future risk, and I'm trying to figure out what the present risk is that this program is in effect. We haven't seen any number on that. No, we don't have any estimate of the present risk of poultry under these facilities, although we do know that there are facilities that are moving into doing this. The government hasn't challenged that, and frankly, the government has not challenged its own estimate that there's 99.9% of domestic poultry that will be produced by plants under these rules except. How long does that process take? They estimate that about 12 plants will be adopted per month, and so if you have 219 facilities that are estimated that will be adopting this program, you can do the math a matter of years before all facilities, but the smallest will switch over to the new system. Thank you. Let me ask about risk, and the risk that there will be, I guess, a higher incidence of poultry coming off the line that may have some sort of food-borne bacteria in it is one thing. That's separate and apart from the risk that that bacteria will actually cause an injury in the consumer. What have you alleged or what evidence have you placed before us that helps translate any increased incidence of bacteria in poultry into real harm to human health? Well, I think that the government alleges that these rules, and we contest this allegation, they contend, we contest this contention that actually their rules will increase public health. We have demonstrated, in fact, evidence suggesting that these rules will not increase public health. So the premise behind this entire rulemaking is that there will be increased or decreased public health. I also turn the court to the attention of Sierra Club and Louisiana Environmental Action Network case, where the court announced that the standard was whether there were adverse local conditions that may harm public health in an environmental dispute. And so where you have 99.9% of all domestic poultry that will be produced by plants operating under this system, you have this adverse impact. And then the plaintiff's allegations of injury are not only this increased risk from the poultry plants, but also that they have to go spend their declarations that plaintiff's members have provided that indicate that not only are they concerned about the increased risk, but also that they would go to great lengths and spend additional costs to avoid this injury, which is more than reasonable given the risks of harm from the product, from the rules, as well as the ubiquitous nature of this tainted product. Well, I think that that's not really answering my question. I'm sorry? If you look at how we looked at injury in public citizen, we said that the injury isn't the increased likelihood that there may be a tire blowout. The injury is the increased likelihood of actual physical injury, property damage, or death. So we have to look at whether the regulation at issue is going to cause property damage, physical injury, death. I haven't seen anything in your complaint that translates into any kind of concrete estimate, or even guesstimate, as to how this will translate into increased physical injury. Well, let me, Your Honor, talk about the evidence that we've brought forward that demonstrates this substantial increased risk of harm under the new rules. And I think it's important to remember kind of the context of the data that's before the court. The government put forward a pilot project. They described it akin to a drug trial. They took a group of plants, subjected them to a treatment like a drug trial, in this case pulling government inspectors from the slaughter lines and allowing them to increase speeds and see what results. And some of the data from this analysis, a very small slice of this data, is in their 2011 report. But plaintiffs obtained on their own data showing that over the course of 10 years, a vast majority of plants, 14 out of 20 plants, had a higher rate of salmonella than when they were in the pilot than when they weren't in the pilot. This, along with the other evidence that plaintiffs have brought forward, shows that there's more than a hypothetical threat from these new rules. And that's the burden to demonstrate standing at this case is whether there's sufficient... But it's not, though. The burden is showing that there's a risk of injury, showing that there's more salmonella. I mean, what if 50% of the chickens processed have salmonella in them? And because of the new regime, 51% have salmonella in them. That doesn't really tell us that more people are going to get sick. I think that you have to look at this court's decision in mountain states, which is where the court based the evidence on the record to show that there was increased risk. The public citizen case is a very different case, very different from the facts here. And the court required more statistical evidence, given the fact that plaintiffs did not simply, or petitioners in that case, didn't simply assert that they would suffer greater harm under the standard that was adopted by the agency. Rather, in that case, the standard was 20 PSI or 25% below the placard level, and petitioners alleged that they suffered injury because that was not as good as their own preferred alternative, which was the Tire and Rim Association standard. So given that this evidence clearly would not be in the record, the public citizen court required more statistical evidence. But that doesn't mean necessarily that all cases need to have such statistical evidence. And if you look at mountain states, the court relied on the increased risk of harm based on the evidence that was in the record. And in this case, plaintiffs had brought forward this statistical evidence that 14 out of 20 plants had higher rates of salmonella, and the government has not even challenged this data. So this is more than the amount of evidence needed to bring the threat, to demonstrate that the risk of harm is more than hypothetical in this case, and that this is just a different case than public citizen, where it was an allegation that the adopted standard wasn't as good as the one that the petitioners had hoped for. Public citizen was a summary judgment case, and this is 12B6. And so what is your view of what showing must be made within the complaint to demonstrate the type of risk that Judge Wilkins is referring to? Yes, that's absolutely right, Your Honor. The test on dismissal is whether there are plausible facts alleged to demonstrate injury. And in this case, it would bring the risk of adulterated poultry out of the realm of the hypothetical, and the court can only— I think, if I'm—I don't mean to misspeak, but I think Judge Wilkins is looking for a comparator, right? What was the risk under the old program, the program that you think, the inspection scheme that you think shouldn't have been altered, and what happens here? Where is the relative measurement? Right. Well, I think that the baseline is that under the old program, facilities were producing a certain amount of salmonella poultry. I don't have that statistical data off the top of my head, but those plants entered into the pilot project, which is supposed to mimic the rules, and a vast majority had higher rates of salmonella. How much higher? They were roughly between—well, there was 8% versus 7.2% all plants. I'm sorry, so it was 7.2% for non-pilot and 8% for pilot? Yes, that is absolutely right. And plaintiffs brought forward that evidence, put that into the record, and the government doesn't challenge—this is a good difference between this case and the public citizen case, which was brought on summary judgment. In that case, the defendants challenged the statistical evidence, and the court looked very deeply at whether plaintiffs had brought forward sufficient allegations, both given the statistical evidence that was presented as well as given the fact that it was on summary judgment. In this case, the government does not even challenge the legal validity. But here's, I guess, what I'm trying to drill down into. What I don't know is if a chicken carcass comes off of a vine and it's positive for salmonella, is it a one in a million chance that a consumer will actually get sick? Is it a one in a billion chance that a consumer will actually get sick because of the food handling and cooking, et cetera, that the consumer actually undertakes before they consume that chicken or turkey? Or is it a one in a hundred chance? I don't know. You haven't alleged it. You don't have any expert data. If it's a one in a billion chance and you're telling me that even if I accept it's true, that it's 8% versus 7.2%, how does that translate into a real appreciable risk of human harm, of physical injury? Right. Your Honor, what I'm saying is that this detailed risk analysis that you would like is just simply not necessary under this Court's precedence in order to obtain standard. In Mountain State, for example— Our precedent and the Supreme Court's precedent says that you have to show actual injury. Absolutely, Your Honor. And injury isn't just that there's a dirty chicken. Injury is that I got sick. Absolutely. And nobody can test that salmonella in poultry is a serious health problem, and nobody can test that plants had higher rates of salmonella when they entered this pilot— Salmonella in poultry might be a health problem for the chicken, although the chicken's already got a health problem because he's dead. But it's not—it's not—I mean, you're not getting my point, are you? I'm getting your point, Your Honor. I'm saying—I'm contesting that, in fact, you would need this sort of detailed statistical analysis. And I again turn the Court's attention to Mountain State, where the Court based its assessment that plaintiffs had standing based on the risks presented in the administrative record, that there was a higher retention rate of fuel, and therefore that there was a higher risk of forest fire and a higher risk of lightning, given lightning strikes. That sort of analysis the Court has never overturned. And I also want to turn the Court's attention to the Bower case, because this is out of the Second Circuit. And there the Court found that there was standing for the plaintiffs who had challenged the government's policy that allowed downed cattle into the food supply despite the risk of bovine spongiform encephalopathy. In that case, it was the government's data that showed that there was an increased risk of BSE. In this case, it's the government's data showing that the pilot plants had higher rates of salmonella that demonstrate that there's a sufficiently higher risk to bring it out of the realm of hypothetical at this stage in the case where all allegations must be taken as true. I also want to turn the Court's attention to the easy inference that can be drawn from this case and the statutory violation of injury. And that did not exist in the public citizen case. The lower court ignored any inference of harm that can be drawn from the alleged statutory violation. The defendants go to great lengths not to discuss plaintiffs' claims, going so far as to misconstrue plaintiffs' claims and say that plaintiffs are simply challenging the new rules for not being better than the former system. They simply have no argument that under 21 U.S.C. 455C, Congress specifically provided that inspectors were to condemn, quote, all carcasses and parts found to be adulterated, unquote, and supervise the reprocessing of poultry that is salvageable. I don't see how that helps you with your standing argument, though. Because the test is whether there's a substantial increased risk of harm. In this case, Congress specifically indicated that there were risks of not having inspectors on slaughter lines doing these condemnation determinations. So at least there's an inference that can be raised. And this is akin to the Supreme Court's decision in Laidlaw, where the plaintiffs simply needed to demonstrate that they had standing based on the alleged statutory violation of the Clean Water Act permit. They didn't have to show in fact that there was a chance of environmental harm, like the defendants had argued that they should have. And that decision was not overturned by the Supreme Court's decision in Clapper. In fact, it cited to that decision and simply distinguished it on its facts. I think this shows that there's a lesser burden for standing when plaintiffs have alleged a clear statutory violation. And the First Circuit, in the recent Karen v. Tyflex decision, in fact indicated as much, saying that it is easier to demonstrate standing when linked to a statute or standard of conduct that allegedly has been or will soon be violated, in part because the legislature and the executive agencies, the branches tasked with evaluating the risk and developing safety standards, have already identified the risks as injurious. I think that you can't ignore the risks that Congress itself defined in setting out this procedure. And here are the government's rules by pulling government inspectors off the lines, shows at least there's a plausible inference of risk. But I should also say plaintiffs brought forward not only the statistical evidence of increased risk of harm, the 14 plants out of 20 that had higher salmonella rates, but also a plethora of other evidence, statistical and qualitative evidence, that shows, in fact, that there was an increased risk of injury. Again, your evidence shows, at best, an increased risk that we don't know how to quantify it. But some increased risk, if we take it and give you the benefit of every inference, that more chickens come off the line with salmonella. I still don't see where your complaint or any of your evidence translates that into an increased risk of actual injury to human beings. And more specifically to your clients. Right. And just to be clear, because I don't want to be seen as dodging the question, we do not have a statistical analysis, like in public citizen, that translated it down to the member of the increased risk. But I also want the court to remember where we are procedurally. This is a case where plaintiffs brought a motion for a preliminary injunction. And the court sua sponte dismissed all of plaintiff's claims based on this motion, simply because they had brought a preliminary injunction motion. This did not apply the right test for dismissing on standing, which is whether there are plausible inferences that can be raised. I think there are plausible inferences of injury, given the fact that you have a program that Congress specifically designed to prevent consumers from having adulterated poultry, that the government presented a program to try to eliminate these risks, that it's rolling back this program, that it's undisputed, that their attempts to supposedly increase the public safety actually was a pilot program that resulted in higher risk of injury, and that these rules would create product, or would produce product, that would produce 99% of all domestic poultry, a ubiquitous harm in the environment. This demonstrates sufficient allegations, when taken as true, that there is an increased risk, bringing it out of the realm of hypothetical, under Bauer, certainly under Mountain States, plaintiffs have met their burden at this stage of the case to demonstrate their standing. All right, if there are no more questions, we'll give you some time to reply. Thank you. Mr. Tenney? May it please the Court, I want to start with the Salmonella numbers, because that's where attention seems to be focused here. Plaintiffs point to a statement that 14 out of 20 plants, based on their analysis, had an increase. There was a question about how much the increase was, and that sort of underscores the nature of the statistic that they've picked out among all of the studies that have been done upon which they're premising their claim. They just sort of went plant by plant. They didn't do an analysis of any statistical significance. In one case, I think it was 3.5% under one regime and 3.6% under the other scheme. That counts just as much as if it was a 25-point increase. What they're challenging, though, is a rule that concluded that they've emphasized the part of the rule that said government inspectors won't be going carcass by carcass, taking the first cut at sorting them to make sure that they physically appear to be suitable for human consumption. What they're ignoring is what those inspectors are doing instead, which is doing other types of activities, including complying through- That's an awful lot like a merits argument to me. We have to, at this point, take all allegations of fact in the light most favorable to the plaintiffs, including their allegations about if there's a dispute about you don't like their statistics and they don't like yours, for now we credit them and any reasonable inferences that could be drawn from them. You don't dispute that's the standard because they have not appealed the PI. Well, if you look at the- I mean, just taking that- Is that the standard? I think that the district court, in the context of a standing dismissal, does have some ability to look at all the materials that are in the record on a 12B1 or equivalent motion. To look at all the materials on the record but has to take all that evidence in the light most favorable to the plaintiff and all reasonable inferences that can be drawn from it. And so if it's your statistician versus their statistician, we're going to have to, at this point, assume, unless it's on the face of the complaint and the face of the evidence without further inquiry, that they're going to win that debate. Well, that might be true if they had a statistician, but if you look at their complaint- Where does- What court has held that you have to have a statistician at the 12B6 stage? I'm not saying they have to have a statistician, but if you look at the allegations of their complaint, if you look at the joint appendix starting at page 33 and you look at what they're actually alleging- I mean, first of all, they don't even have an allegation in the complaint, a bare allegation. I'm not saying this would be sufficient, but there's not even a bare allegation that there would be a substantial increase in risk. What they have is they say the government did this study, then they talk about what the government found, much of which is favorable to the government's position and unfavorable to their claim of standing. And then they walk through and they have specific critiques, and they say, we think we have this 14 out of 20 number that we came up with. We're not saying that that's wrong. We're not saying they're not going to come up with facts at trial to prove that that's true. We're just saying that, on its face, taken as true, it is true, isn't good enough, especially when you look at the other things which are alleged in the complaint, the documents that are referenced specifically in their own complaint. Can you add on the fact that you've got a GAO report that's got problems with your project? They've got declarations from people, poultry inspectors and employees, talking about risks that are created by this project. They might be completely wrong. I don't know if they're right or wrong, but we don't at this point get into a they have this, you have this, they said this, I don't like this about your evidence. Don't we just have to say, isn't that enough? That seems far beyond what we ordinarily require from anybody in a complaint at the 12B6 stage. Well, you would ordinarily, I mean, again, this is a standing case, and this Court's precedents have established that courts have discretion to look at the materials that are in the record. But also, even in a regular 12B6 context, what the plaintiffs have basically come forward saying is, the government has not adequately proved that this will be better for public safety. That's really, if you look at the allegations, if you start at page 33, which is where this really begins in their complaint, they try to poke holes in the government's study. They say the government was arbitrary and capricious. They say the government hasn't, you know, that there are these problems. Of course, that's what an APA complaint always says, right? There's nothing wrong with that. The question is, for purposes of injury, have they alleged, and I'm looking at the whole record, I'm not just looking at the complaint, but have they alleged, and between the combination of the complaint and the other materials that they have, have they alleged a substantial risk of injury? Right, and I can't, I read over their complaint, and I read over their affidavits, and I haven't found that allegation at all, and I certainly haven't found material, like, a basis, because this is a prediction of a future injury. This is harder to establish than if they were saying there was a fact in the world. Is this also a present injury now? It's not purely a future injury if this is happening right now. Well, there... It may not be up to 99% yet, but there's certainly... Are they wrong to say that poultry is being manufactured right now under your scheme? They're not wrong to say that. They are wrong about the 99%, which I can get to, but... Okay, but we've got a present risk as well as a future risk, and it's a present risk that's expected to increase, maybe not to 99%, but it's certainly, I assume, you expect increase in people joining this new program. We do expect more. We don't expect the risk to increase. We expect the risk to decrease, and that's what we're here arguing about. Well, it's not a decrease if people don't join it, right? If you think your program actually reduces the risk of injury to the public, then I'm not quite sure why you can say, but it's fine to keep going with the old program with whatever that risk of injury was. Don't you want people to join this because you think it reduces the risk of injury? Well, I mean, one of the... I mean, they're not challenging the fact that we made it voluntary. One problem, one reason to make it voluntary is that one of... It's possible that one of the reasons that the program works well is that the plants have to comply with it, and the plants that have agreed to take this on are maybe better situated to do these tasks. But I just want to clarify one thing. Do you think that there will be less risk of injury if more plants come with this program? Yes. Do you believe this program decreases the risk of injury? Yes. Yes. So you want more people to marry her in this program. Yes. People who stay in the old scheme will have a higher risk of injury is your position. I mean, we would encourage... I mean, the agency made this available to plants. It recognizes that some plants might be situated in a way that they wouldn't want to take this on, but they think that having plants and supporting them in doing this will decrease the risk of injury, yes. So is your hope, is your prospect that a large percentage will join this program? I don't know that the agency has quantified... Really? I mean, they do want to make it available. They want plants to do it. I don't think they've said we want to have all of them or we want to have most of them. I'm not sure there's something in the record on that point. I guess I just don't understand why, if they think this decreases the risk to the public, they wouldn't want and expect people to come on. They do want there to be a good take-up rate, and I think I just don't want to... What's a good take-up rate? I don't want to go... I don't think they've expressed that. I don't want to, from the podium, try to opine on what the agency is saying. I can tell you what the agency has said. In the proposed rule, they proposed making it mandatory. That's where a plaintiff is getting them. We know it's going to be 99%. In the final rule, they said, we expect that this will be beneficial for plants and that plants will want to do this, and we think that the plants that take it up will have a decrease in the risk and that they'll want to do this. But there's uncertainty. We're not sure how many are going to want to do it. We're presenting a range of estimates. We're not saying that any of these is the most likely or the least likely. That goes to plaintiffs' claim that we know that it's going to be 99%. That's just not what the agency said. Can I just be clear on one thing? Is the uncertainty as to how many will come on, or is there uncertainty as to how much of a change in the risk of injury will come between the old and the new program? Well, what I was just talking about was the uncertainty about how many plants would come on. Obviously, these are statistical estimates. There is uncertainty about the nature and the magnitude of the change in risk. But just to go back to the point that we were discussing earlier, the plaintiffs have tried to poke holes in the government's assertion that this is actually going to make things safer. That's what they're trying to do. And we think that on their face their allegations don't suffice even to do that. But even if you give them that, they still haven't gotten all the way to showing that there is a substantial increase in the risk to consumers of eating contaminated poultry. If you look through their allegations, their allegations are all about the government's study was inadequate. And then you could look at their numbers. They're basically trying to rest on these numbers that they've picked out. And they're trying to look at the evidence that the government has put forward and picking out the few things that they think are the best for their case. What's your response to the citation of mountain states in that the injury here is akin to the injury that we recognize as being sufficient in mountain states? I mean, in mountain states, I think what we were talking about was the – I mean, I understand that we'd be talking about the portion of mountain states that talks about that there's a risk that people are going to die because of what's happened. And we think that if they could establish a substantial increase in the likelihood that people would eat contaminated chicken and get sick, we're not disputing that that would be the kind of injury that would be recognized. And I don't think there's any dispute between the parties, especially after public citizen, that the standard is that you have to show a substantial increase in the risk of injury in order to have standing. The dispute here is whether they've really put anything forward in their complaint or anywhere else that suffices to make that showing, which this court emphasized needed to be stringent. This court said in public – We don't have to show that that translates into an increased risk that somebody will actually get sick. Do you agree with that proposition or not? I mean, I don't think I agree legally with that proposition. I think it's true that if you had a substantial enough increase in the risk – in the prevalence of salmonella coming off of the line, then that would translate – I agree that you would have to then discount that for the fact that sometimes salmonella contaminates something and nothing happens to anybody. And we haven't even sort of gotten to that point where they would have – I agree that it makes their showing even harder, and I agree that there's nothing in the record that tries to make that additional step of logic. The problem is it's a little bit hard for me to stand here and say how you would assess it because, in our view, they haven't even shown – in the district court's view properly, they haven't even shown that there's any risk of increased salmonella at all. But I agree that that's an additional problem. So I think I heard counsel say that they didn't have anything, and I think that's right. That would demonstrate that next step. I'm not very scientific, but if X percent of birds come off the line with salmonella in them, the chance that – what happens after the bird comes off the line, the chance of someone getting sick is static between the two programs, right? There's just – there isn't some change in how people cook, how they buy, where they buy. That's a static number. The risk of anyone contracting illness from salmonella-infected chicken is in effect – out in the real world, once it comes off the line, isn't affected by this rule. The only question – people will cook it or they won't cook it right. The only thing – the question is you've got that static number, but then if you start increasing the amount of salmonella coming off the line, then necessarily this number increases. Some people will cook, some people won't. That's going to probably remain the same, and that's not what they're here to fight about. But they're saying as soon as you start increasing the number of bad stuff coming off the line, then necessarily – necessarily the increase of risk to human beings increases as well. Is that not – am I wrong? I mean, I think the logic of that is right, and if it was true that all you needed to show was a bear risk and a bear increase in the risk of injury, then that might have some force here. The problem is that even if you have a static number, if you need to show a substantial increase in the risk of injury, for example, if you said – and this is, as you know, in our view counterfactual – but if you said there's a 1 percent increase in the number of chickens with salmonella, and then you had this static number, and, you know, if the static number was every time a chicken comes off a salmonella, someone gets sick, that might be closer to being a substantial risk of – substantial increase in the risk of injury. If that static number is one in a million, that even if it has salmonella, only one in a million people get sick, then you wouldn't say that's a substantial increase in the risk of injury. So it's true that you need evidence on this point as well, and that is another shortcoming with their analysis. I agree it has to certainly demonstrate substantiality. Do we factor into substantiality the consequences, the seriousness of the consequences? Imagine if a chicken comes off the line with salmonella, and it's not cooked right and not handled right. There is virtual certainty of death, just assuming – I'm just making this up – virtual certainty of death. But there's only a very tiny amount that comes off the line like that. Is that a substantial risk? Because people are going to be pretty worried about that, right? If it – not many people are going to get it, but the five that do will die. Well, in answer to the beginning of your question, in mountain states this court did take into account the severity of the risk in figuring out what's substantial. I don't think it's true that even a tiny, tiny increase in risk, if the consequences are catastrophic, would suffice. Public citizen itself can attest to that. What we were talking about there was audible. That was summary judgment again, so I'm talking about at the 12 v. 6 stage. Imagine the government had – not this government, some sinister government takes over, and they decide we're going to – we know through this production process that every other week one drop of cyanide falls into this, and whoever of all the millions of people in this country eat it, that one person will certainly die. Nobody can challenge that? We don't care. I don't think the procedural posture of public citizen really affects this part of the analysis, because the question there was at the end of the day what a plaintiff needs in order to have standing. Now, you can debate, and I'll hear. If the government knows there's going to be death, but it's going to be one in 100 million, but the new program will increase death, there's going to be one more death out of 100 million, is that substantial or not? Because it's death, but it's still only one in a million or 100 million. I mean, I don't think this court's precedent suggests that something that – to any given individual that the risk – I mean, another way of putting that is, is the risk to a given plaintiff is one in 100 million that they're going to suffer an injury. I don't – I know, but it's almost like this Russian roulette, right? The government can have a program that they know is going to – severely harm or kill a small percentage of people, and you say no one can challenge that because it's not a substantial risk as to any given individual. Is that right? I mean, obviously, as you say, that's far from what we have here. I know, but is that right? And I think if there were such a government program, you know, there would be other mechanisms to try to ferret it out and eliminate it. Well, I'm not sure what those would be. So you're saying – I guess if there's other mechanisms, you're saying an APA lawsuit would not be one of those mechanisms. I think if an individual – you know, ordinarily individuals have to show likelihood of harm to them personally, and if you had a sufficiently slow and small harm, and you could dispute how small it would need to be given the big consequences, but if you – you know, I understand the hypothetical to be deliberately selecting a number that's incredibly tiny. You know, the Article III jurisprudence of this court in the Supreme Court suggests that a plaintiff just needs to come forward with more than that. Obviously, in this case, we don't need to go nearly that far, because they haven't – you know, they haven't come forward with evidence of a substantial – this is not a program designed to kill people. Obviously, this is a program designed to help people, and they haven't come forward with evidence to show that it's actually going to have the opposite effect. In public citizen itself, I would just like to note in response to the comment about the statutory allegation, public citizen in this court absolutely said we have to assume that they are right, that the statute requires more. That's on page 1296 of the second public citizen opinion. We have to assume that they are correct, that the statute requires a more stringent standard. So that's exactly the same situation that we have here. We think this court's precedent suggests that they're wrong about the statutory claim, but our submission here isn't really dependent on whether they're right or wrong, that the agency was arbitrary and capricious, whether they're right or wrong, that the statute requires something different from what the agency has done. Our submission here relates to the fact that their allegations, if you take all of them, particularly I think it's fair, and I think in 12b-6 even, and certainly in 12b-1, you would also take those allegations in context, and if you have a report, for example, they cite the report that says there's selection – people have criticized us for saying there's selection bias in the study, and then the next sentence says, however, we don't think that because these are geographically dispersed and because they're all different types of plants, we don't think you could plausibly say that there is any geographic or plant selection bias in the study. And they cite the first sentence, and they say you have to take that as true. I don't think even in the 12b-6 context anyone would suggest that if somebody takes a quotation like that, but if you read the whole paragraph, it's clear that what the government was concluding was the opposite of what they're saying, that you have to ignore the rest of it. And the same with the salmonella. They're saying, here, we've picked out some statistics, or they have another example where they say, under certain – there were certain problems that were heightened, and it turns out if you look at the underlying materials, they don't specify which those are, and there were more problems that got better. I guess what I'm really trying to figure – so if you take a clause out of a sentence out of context, that's one thing, but they've got declarations, and I'm really struggling with where the line is between – I'm sorry, I said 12b-6 because you write 12b-1 – where the line is between determining that they've alleged enough at this very preliminary stage to raise a plausible allegation of increased risk of injury without blending into the merits of the analysis of who really has the better argument. And I'm very much at sea as to how deep we're supposed to go, and I don't think public citizens are guideposts there, because that was summary judgment. We're necessarily going further, so we can't go that far. So how far do we go at this stage? I mean, I think there's – a useful way to look at this, I think, is to think about – there are two separate questions. One is sort of what, at the end of the day, they're going to need to show in order to have standing, and at that point we think public citizen really is the guidepost. Then the second question is, does the fact that this didn't go forward to summary judgment but instead was dismissed in an earlier state of litigation, how do we address that? And on that point, the second point, the question really is a question of – because in 12v1, as opposed to 12v6, district courts do have some more discretion to look at everything that's in the record. So the question really is a question of – But what we're looking for is different than what we're looking for at summary judgment, correct? We're just looking for plausible allegations of a substantial risk. I mean, I guess two ways of getting at sort of the same point. One is to say, if you take the actual statements in their complaint, you can assume that they're all true. They say the government study said this. There are 14 out of 20 plants that say that. We're not saying we're going to come forward with evidence on summary judgment and say that their math is wrong and they've added incorrectly or that the government study was misquoted or something like that. But the question is, if you look at the stuff that they've alleged sort of in the context in which it was stated, and you look at those allegations, you take them on their face, you're not saying we're going to say there's a failure of proof that paragraph 149 of the complaint we deny and then we say that it's – we disprove it with evidence. And even if you read their complaint that way, and starting at page 33 you can read through their allegations and see if you say, all right, all that stuff is true. I'm going to take it in the context in which the statements were made. I'm going to take it against the backdrop of the very studies that they're citing in the complaint, which are incorporated by reference in some sense into the complaint, and figure out whether that whole picture, not saying the government has this other stuff that we're bringing in saying that that's wrong, but if that whole picture, if you read it and you say, no, this isn't enough, even if they could establish all of these things, they wouldn't have standing. That would be one way to look at it. Another way to look at it, which is sort of similar, is to say, okay, what's the prejudice here? What happened was they filed comments to the rule. Then they filed a complaint. Then they sought a preliminary injunction where they would have to show irreparable harm in addition to showing standing. Then the government opposed their preliminary injunction on the ground that there was – that they didn't have standing. So then they got an opportunity to respond to that. And so if their argument is, well, there's prejudice because there's this other stuff  I mean, they certainly haven't told us what that is going to be. It's pretty clear from the complaint, from the face of the complaint, and from all of their submissions, that what they're saying is the statistics or quasi-statistics, numbers picked out, that we've come forward with, we think that's good enough to establish standing. But wait a minute. You're talking about the procedural injury, the oral presentation? No, no, no. No, I'm talking about basically if the district court had said, all right, I can't do this on motion to dismiss. I'm going forward to summary judgment, which is I gather what the plaintiffs want. Then the district court would then say, okay, everybody give me your summary judgment submissions, and then I'll figure out if there's a genuine issue of material fact as to standing. I think that if I'm understanding them correctly, that's what they think is supposed to happen. And so in the 12B1 context, sometimes district courts can sort of say, all right, I'm looking at the evidence and the record. And then if they had a case here and they were saying, look, there are these allegations in our complaint, but we haven't had a chance to prove them yet with evidence, and so it's unfair to me to say, okay, I'm just looking at the whole record and saying you don't have standing, because I've got all this stuff that I haven't had a chance to put in. I'm talking about the procedure of the litigation, not the procedure of the administrative proceedings. That's just not the claim that they brought here, that their complaint doesn't say, and we will prove at trial with evidence this or that. Who filed the motion here? The motion for preliminary injunction? Yes. And then did you guys file a motion to dismiss? No. Or was it just filed on the PI? Okay. No, the district court concluded based on looking at the record. But then the district court, I assume you concede, erred when it applied that preliminary injunction standard across the board and then dismissed the case rather than just deny the preliminary injunction, dismissed all the claims, including those for which it was not seeking a preliminary injunction, based on the failure to meet the preliminary injunction standing standard. Well, I mean, that's not the way that we would have put it, but we don't think that what the district court did was wrong. Because what the district court looked at, basically what the district court had before it is a preliminary injunction motion and a complaint. And they said, I've looked at all of this, all the parties' submissions in which they've disputed standing and the merits, and I've looked at the allegations of the complaint, I've looked at the materials put forward in support of the preliminary injunction, I don't think they have standing. Okay. So at least you can deny the preliminary injunction on that ground. And the district court said, not only do I think they don't have a likelihood of success in establishing standing, which would be enough for the preliminary injunction, it's clear from the record that's before me now, they're never going to be able to establish that they have standing. And so in order to say that that's true. But she has to say that it's not plausible. And I didn't see her applying that standard. Well, I mean, once you're looking at the record evidence, and again, the delta between the evidence and the record and the allegations of the complaint, there isn't that much difference. They've got their declarations, she took account of their declarations. But if you look at what they're saying in the complaint, basically they're saying, if you look at all of these studies that the government did and our critiques of them, we think that that adds up to enough for standing. And so the two ways I think that they could prevail in this court would either be to say, no, that's wrong. We think that if you look at all of that stuff, there is enough for standing. That would just be forgetting the procedural posture, the merits question. Or, and we think that that, you know, what they put in so far just isn't good enough for standing. And that's what the district court found. And you can't find a procedural error with that. And for that, you can look at public citizen and you can look at the standard and that's just on the sort of substance of the matter. Or they could come in and say, well, no, the problem is that it was unfair because at this preliminary stage we didn't get a chance to establish these other things. I mean, I'm not sure why one would withhold evidence of standing or of harm at a preliminary injunction stage. But if they thought that they had done that and they had been prejudiced by the district court's conclusion that the litigation could be wrapped up at this stage, then they could come to this court and say, no, no, no. We're not just relying on the government studies. We're not just relying on our comment to the rule that we already put in. We're not just relying on the materials that we submitted in support of the preliminary injunction. The district court should have known that, in addition, we had all of this other stuff that would be probative of the standing question that's before this court. And they certainly haven't mentioned what that would be in any way that would suggest that it would change the outcome here. I suppose the government's position is that if we can affirm on whatever grounds we find appropriate, if it's consistent with the north court's judgment, then if we were to find that the allegations don't meet the 12B1 standard, then we should affirm. Right. I mean, we think that's one basis on which this court could affirm. We think that that would be correct. Thank you. Mr. Corrigan, why don't you take two minutes? Can you start by answering where he left off? Is there anything more you would show? If we were to go back and go to summary, if you had plausible allegations, but we didn't think you had enough to meet the public citizen test, is there any point to sending it back? Well, two points, Your Honor. First of all, if I could just take a step back and just say, I didn't hear once the government refute plaintiff's evidence that 14 out of 20 plants had higher salmonella rates when they were part of this pilot than when they weren't. They seem to throw up their arms and say it's anecdotal or it's not good enough, but they don't say why. They don't say what's the problem with the evidence. It's uncontroverted evidence that certainly at this stage, but arguably even on a summary judgment standard, would be enough to demonstrate injury. If this was brought at summary judgment, if we brought a motion for summary judgment, we had brought forward this evidence and said 14 out of 20, this was not data that was the government's. I mean, it was government's data. They did not put it into any of their reports. When we brought this forward to them, they did not respond to it in the response to comments. If we had brought forward this evidence and said this is enough for summary judgment, the other side would say, no, it's not. And you would say you haven't even brought forward a triable issue of fact to get past summary judgment. No less met your burden to demonstrate that plaintiffs hadn't met their burden to demonstrate standing. So they haven't, even on a summary judgment standard, plaintiffs have not or the defendants have not demonstrated why plaintiffs have not met their burden to demonstrate standing. So your answer to Judge Millett's question is no, you've got nothing else you would add? No, Your Honor. First of all, there would be an administrative record produced, presumed, and there is evidence that we could hope to rely on in the administrative record and a good example of what we expect will be in the administrative record is based on the government's assessment of benefits of this rule. Government assesses that there's going to be great benefits of this rule based on their risk assessment and they say, well, by pulling inspectors from the slaughter lines, we're going to have them do a whole bunch of unscheduled inspection tasks that will really protect public health. That is the presumption of the risk assessment. But in their analysis, they never presented the rates of unscheduled inspection tasks. They don't put it forward in their 2011 report. Presumably it's there. They have the ability to determine when they did unscheduled inspection tasks. They just didn't analyze it as part of their 2011 report. We expect the administrative record would seriously undermine their analysis of benefits and this is the sort of evidence that we could bring forward on summary judgment. In your complaint, you talk about the human health risk of salmonella and how many people get sick from it per year and how many people die from it per year, etc. And you cite to Joint Appendix page 251. I've got that page up and looking at it, it doesn't distinguish between salmonella caused by poultry or caused by broccoli or peanuts or any other sort of food product from which you can contract salmonella. Am I wrong about that? That particular page, I believe, was just overall reports on incidences of salmonella. Did you put anything in the record that showed what the human health risk of salmonella is from chicken? How many people get salmonella from chicken? There's evidence in the record about the risks from salmonella. In fact, the government could have done its own risk assessment without demonstrating. I'm asking what you put in the record in your complaint about chicken and salmonella. I don't have that on the top of my head. I don't want to at this point guess. I know there are a million or so people generally in the U.S. population that suffer from salmonella. I believe that about 14, again, I don't want to speak out of turn. It's not jumping to the top of my head. There is evidence in the record. The government could not have done its own assessment of the benefits of its rulemaking, which we challenge, without defining the risks of salmonella. But here's my point, sir, is that you've got the burden to establish standards. We're talking here about poultry, and you're talking about increased risk of salmonella, other bacteria in poultry. But I haven't seen in your complaint, and you can't tell me standing here today, how many people just in general get salmonella from poultry. You've got some data, like in general, how many people in the U.S. contracted every year, I mean get sick every year, or die every year from salmonella. But that isn't even zeroed in on salmonella from poultry contamination as opposed to other contamination. Right, Judge Wilkins, I understand your point, but as Judge Millett pointed out, it's going to be static. The question for this test is not whether the plaintiff's attorney can, off the top of his head, recall what the injury of the- I'm not asking you off the top of your head, sir. I'm asking what is in your complaint. Right. And if it's static, and it's static as one a year from chicken, and the other 99 cases are from broccoli, then that's relevant, I think. You don't think that's relevant? I think that it is relevant if the court were to require a detailed statistical analysis, but in terms of the increased risk, but in fact that's not needed in this case, because what plaintiffs have alleged is that the rules will increase this risk. It could be one in a billion, it could be one in a million, and these rules increase that risk, and as Judge Millett pointed out in Mountain States, when there's a severe injury, all the court has required is a modest increment of increased risk.  But there, the plaintiffs had contended their injuries were from the government's failure to adopt as good of a standard as the plaintiffs had hoped for, petitioners had hoped for, not whether it was worse than the status quo. And the court, because of the very specific nature of the risk, required a detailed statistical analysis. It simply is not needed in this case. We've said very recently in the Osborne case and also in other administrative cases, or not even just administrative cases, that when we look at what we have to treat as true for the purposes of pleading, it's facts, things that are susceptible of determining whether it's true or false. Demonstrable evidence. Not risks. That when you make allegations as to risk, we don't have to accept those as true. Right, and our position, Your Honor. And you're asking us to assume that all of your allegations as to risk are true, right? No, Your Honor, we have brought forward demonstrable evidence. 14 out of 20 plants had higher salmonella rates when they were part of the pilot project than when they weren't. How much higher? Like the government just admitted. It doesn't matter how much higher? Yeah. If it's .1%? Well, the government doesn't admit that it's too low. They have no response to this data. It's 7.2 versus 8.8. The government doesn't even say, oh, that's too small. They did not even respond to this data point when it was presented to them in the comment period. They have no answer. They say it's just anecdotal. I think the government's position essentially is if the data isn't on USDA letterhead or doesn't support why this rule is great, then the court should just ignore it. And certainly the lower court did precisely that. It weighed the evidence before it and completely discounted plaintiff's facts as true without even assessing why that this evidence, this demonstrable evidence, doesn't show a substantial increased risk of harm. They just have no answer to this besides waving their hands and saying that it's not good enough. I'd like to also just talk a little bit about the context because I think that might help, Your Honor, in terms of assessing the overall risk. Try to do it in a minute because we're way over our time. Sorry, Your Honor. Let me make two points. The first is to just present this evidence in context because it's not simply that plaintiffs brought forward this increased risk based on their by the increased salmonella rates of 14 plants that had higher rates of salmonella compared to those and the fact that the government doesn't respond to this. But also plaintiffs brought forward a GAO study in 2001 that showed that there was danger of self-selection bias in this experiment because only volunteer facilities participated. So you had the potentially best performing plants put on display and they still had increased risk of salmonella. And this is like the Second Circuit's court in Bauer where the court found that there was standing because of a GAO study that challenged the effectiveness of the government's ability to screen tainted product. Same here. They might say that their rules will be great because they'll be able to move inspectors off the slaughter lines and have them do other things. But their own data shows that this is absolutely not true and even amongst the potentially best performing plants. I just want to wrap up by just pointing to the government. The plaintiffs have alleged both procedural injury as well as an organizational basis for standing. The government does not challenge that the lower court erred in dismissing plaintiffs' claims for lack of standing based on those bases for standing. The only thing that can tend is whether in fact there's substantial enough risk of the underlying harm. So plaintiffs simply ask that the court determine those bases of standing based on the briefs before it. Thank you. There are no further questions. Thank you.
judges: Henderson, Millett, Wilkins